# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# CENTRAL DIVISION

| | |
|---|---|
| _____ ) | |
| ) | |
| ) | |
| In re: ) | |
| ) | Chapter 7 |
| KEVIN J. BARRY, JR. and ) | Case No. 07-44352-HJB |
| KIMBERLY A. BARRY, ) | |
| ) | |
| Debtors ) | |
| ) | |
| _____ ) | |
| ) | |
| ) | |
| JOYCE A. WARCHOL, ) | |
| ) | Adversary Proceeding |
| ) | No. 08-04040 |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| KEVIN J. BARRY, JR. and ) | |
| KIMBERLY A. BARRY, ) | |
| ) | |
| Defendants ) | |
| _____ ) | |

## MEMORANDUM OF DECISION

Before the Court is a complaint (the "Complaint") filed by Joyce Warchol ("Warchol")

against Kevin and Kimberly Barry ("Kevin" and "Kimberly"; together the "Barrys") asserting

claims arising under §§ 523 and 727 of the Bankruptcy Code.[1]   During the course of a

multi-day trial, each party presented varied accounts of the relevant prepetition events that

---

[1]  Unless otherwise noted, all statutory references will be to Title 11 of the United States
Code. 11 U.S.C. §§ 101, et seq.

transpired between them.  Having sifted through that testimony and reviewed the admitted

exhibits, this Court makes the following findings of fact and conclusions of law, pursuant

to Federal Rule of Bankruptcy Procedure 7052.[2]


I.        FACTS AND TRAVEL OF THE CASE

Joyce Warchol, the plaintiff in this adversary proceeding, resides at 9 Bradstreet

Road, North Andover, Massachusetts (the "Property").  In 2000, Warchol met Kevin, one

of the debtor-defendants in this action, through her neighbors.  Warchol wanted to have the

exterior of the Property painted, and her neighbors recommended Kevin's work.  In 2001,

Kevin painted the Property for the approximate sum of  $5,000, and Warchol found the

work quite acceptable.  During the time that Kevin was painting the Property, Warchol

mentioned to him that she hoped to further renovate the Property and build an addition to

accommodate her disabled mother.  However, at that time, Warchol did not have the

financing to fund the project.

During 2002 and 2003, Kevin and Warchol spoke several times about the proposed

renovation, and in March of 2003, Warchol told Kevin that she had the necessary funds.

They met on several occasions during the spring to discuss the project.  Warchol gave

Kevin explicit instructions about the accommodations needed by her disabled mother,

including a bathroom that could accommodate a person in a wheelchair.  On June 20,

2003, Warchol and Kevin signed a contract and agreed the project would be completed that

---

[2] Federal Rule of Bankruptcy Procedure Rule 7052 states that "Rule 52 F. R. Civ. P. applies
in adversary proceedings."  Federal Rule of Civil Procedure 52(a)(1) states, in relevant part: "the
court must find the facts specially and state its conclusions of law separately."

summer for the sum of $35,000.  The scope of that original work was disputed throughout trial.

Shortly after execution of the construction contract, Kevin's crew demolished Warchol's kitchen and downstairs bathroom.  After the demolition, no work was done on the project for several weeks because, despite his prior assurances to the contrary, Kevin had not secured the proper permits.  Kevin also did not have the proper license to oversee the work that was being done on the Property.  Despite the absence of progress, Warchol continued to make payments to Kevin because Kevin threatened to leave her home in a demolished condition otherwise.  But even after the work recommenced, much of the work was substandard, and some of the workers were unlicensed.  When work finally progressed, albeit slowly,[3] Kevin demanded payments from Warchol more fervently, even threatening to put a lien on the Property if she did not pay.  In total, Warchol paid Kevin $75,300,[4] hoping that further payment would result in the work on the Property being finished as agreed.  It did not.

By April 2004, Kevin and his crew were no longer working on the Property, and Warchol was left with a disastrous list of property damage caused by Kevin and his workers.[5]  On July 1, 2004, Warchol commenced suit in the Commonwealth of

---

[3] From June until early October, Warchol had no running water in her kitchen area, despite the August completion date contemplated by the contract.  She was left with only a toilet in the middle of her demolished kitchen for many months.

[4] Kevin argues that much of the price difference arises from post-contract changes insisted upon by Warchol.  In light of the disposition here, the Court need not resolve that dispute.

[5]  While the quality of the work of Kevin and his employees is largely irrelevant to the outcome here, it is worth noting for contextual purposes. The roof of the addition was constructed in a way that caused damage to the roof of the existing house, as well as a persistent leak.  The bathroom was left unusable in the winter months because it was unheated and uninsulated.  The

Massachusetts Superior Court Department of the Trial Court, Essex Division (the "Superior

Court") against Kevin[6] and sought a real estate attachment on his residence.  Service was

made no later than July 19, 2004.  The next day, on July 20, 2004, Kevin and Kimberly

applied for a home equity loan of $90,000.  It was granted on August 2, 2004.

On July 28, 2004, in response to Warchol's request for a real estate attachment on

his home, Kevin filed an opposition in the Superior Court and attached his affidavit.  The

affidavit contained several misrepresentations.  First, Kevin represented to the Superior

Court that the June 20, 2003 contract was among three parties—Warchol, Kevin, and Dan

Gibney ("Gibney"), a licensed construction supervisor who had the required licenses for the

work needed.  (Ex. 23, ¶ 3). However, the record reflects that Gibney was not a party to the

original contract, and Kevin admitted on the stand that the affidavit contained "mistakes."

(Trial Tr. vol. 2, 202, Dec. 4, 2009).  Second, Kevin represented in the Affidavit that "[i]n

accordance with the contract, Barry Bros. began demolition of the kitchen in and around

June 23, 2003 . . .   The demolition work was completed in a timely and workmanlike

manner and all of the associated debris was removed."  (Ex. 23, ¶ 6).  However, Warchol

provided the Court with photographs of substantial construction debris, which included

kitchen materials, taken in April 2004.  (Ex. 71).  Third, Kevin averred in his Affidavit that

a permit was needed to do exterior work during June and July of 2003 and "we could obtain

---

electrician left wire exposed.  No baseboards were installed in the kitchen.  Kevin and his workers
left significant amounts of debris on the Property.  And, despite clear instructions to the contrary
and being inconsistent with a central purpose of the project, most of the spaces were unable to
accommodate a wheelchair bound person.

[6]   From the Superior Court docket entered as an exhibit at trial, it appears Warchol
commenced the original action against Barry Brothers Painting and Daniel Gibney as well.  The
disposition of those claims was neither addressed at trial nor is it relevant to the outcome here.

the permit because Dan Ginbney [sic], who had been working at the house since June

[2003], was a Licensed Construction Supervisor." (Ex. 23, ¶ 9). But at trial in this matter,

Kevin admitted that Gibney was not working on the project in June 2003 and that this

statement in his affidavit was "not accurate." (Trial Tr. vol. 2, 209-10, Dec. 4, 2009).

Fourth, Kevin stated in his affidavit that Warchol had converted certain of his property and

"she said that she gave [my property] away, resulting in approximately $1,800.00 in lost

tools." (Ex. 23, ¶ 23). However, on the stand in this matter, Kevin readily admitted that at

the time the affidavit was signed he knew another party was responsible for the missing

tools. (Trial Tr. vol. 2, 215-20, Dec. 4, 2009). And, notably, the affidavit did not disclose

that Kevin and Kimberly had sought a home equity line on the same property that Warchol

sought to attach. On August 4, 2004, the Superior Court denied Warchol's motion for real

estate attachment.

Ultimately, Kevin and Warchol opted to enter into arbitration. During the course of

that arbitration proceeding, Kevin and Kimberly granted mortgages on their investment

property, located at 171-175 Broadway in Methuen, Massachusetts (the "Methuen

Property") in April and August of 2007, respectively, to their attorneys to secure "services

rendered and to be rendered." On October 16, 2007, four days after the arbitrator entered

a decision in Warchol's favor in the amount of $234,599.03, the Barrys granted a mortgage

on the Methuen Property in the amount of $9,692.98 to their attorneys in the Warchol

litigation. And on the same day, a mortgage was also recorded on the Methuen Property

from the Barrys to White Street Paint and Wallpaper Co., Inc. ("White Street Paint") in the

amount of $6,800.[7]   White Street Paint was and remains a vendor for Kevin's painting business.

On November 13, 2007, the arbitrator's award was filed with the Superior Court.  On November 29, 2007, Warchol sought a post-judgment real estate attachment on the Methuen Property, but on November 30, 2007, the Barrys sold the Methuen Property.  All of the liens on that property were paid from the proceeds of the sale.

At all relevant times, Kimberly was aware of the Barrys' financial difficulties, the work underway at the Warchol Property, the difficulties associated therewith, the progress of the Superior Court litigation, and the granting of the 2007 mortgages.  Kimberly testified at trial that she was integrally involved with the operation of the Methuen Property, including dealing with its losses and the lawsuits that were associated with it.  Kimberly testified she was responsible for providing the Barrys' financial information to their accountant and reviewing their tax returns, as well as maintaining the checking account for Kevin's business, including during the time of the Warchol project.  Kimberly also maintained all household accounts for paying household bills and expenses and knew of the family's financial difficulties, even turning to a debt consolidation company to consolidate their spiraling debts.  Kimberly signed all four mortgages, as well as the home equity loan application.  Kimberly was heavily involved with all of the financial dealings of the Barry household, including those that involved the Warchol funds and plans to keep all equity in their properties out of the hands of Warchol.

---

[7]  The mortgage reflects an execution date of September 16, 2007, but was recorded together with the mortgage to their attorneys on October 16, 2007.

After years of financial difficulty, Kevin and Kimberly filed a Chapter 7 petition with

this Court on December 16, 2007.  Warchol filed a proof of claim in the case in the sum of

$234,599.03 — the amount of the arbitrator's award.  Warchol's arbitration award was also

listed on Schedule D–Creditors Holding Secured Claims in the amount of $207,663[8], but

as fully unsecured.[9]  The filing of the instant adversary proceeding followed.

II.      POSITIONS OF THE PARTIES

The Complaint contains six counts.  In Counts I and II, Warchol alleges that her

claim against Kevin is nondischargeable under the provisions of §§ 523(a)(2)(A) and

(a)(6).[10] Specifically, Warchol contends that Kevin knowingly misrepresented his ability and

qualifications to handle the project and that she justifiably relied upon those

---

[8] The discrepancy between the amount set forth in the proof of claim and the amount of the arbitrator's award can be traced to a prepetition payment made by the Barrys to Warchol in an amount just over $26,000, per order of the Superior Court.

[9] It is unclear why Warchol's claim appeared on Schedule D as a secured claim.  Warchol was never successful in securing attachment for her arbitration award.

[10] Sections 523(a)(2)(A) and (a)(6) state:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
> . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by–
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
> . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a) (2010).

misrepresentations.  She also contends that Kevin thereby willfully and maliciously caused injury to her and to the Property.  In Counts III through VI, Warchol maintains that both Kevin and Kimberly should be denied Chapter 7 discharges under §§ 727(a)(2)(A), (3), (4)(A) and (5) - because they granted, within a year preceding commencement of the case, mortgages and transferred property with the intent to hinder or delay the collection of the debt the Barrys owed her; failed to appropriately account for the proceeds they received from the sale of the Methuen Property; failed to disclose in their bankruptcy Schedules the settlement of a personal injury claim by Kevin and the disposition of those proceeds; failed to keep appropriate books and records; failed to explain their losses; failed to properly list all of their business income; and failed to disclose the existence and/or value of certain assets.

The Barrys concede that Kevin made a mistake in taking on a job that exceeded his qualifications, but maintain that his actions on the Warchol job and any alleged misconduct that followed violated neither §§ 523 or 727.  Kevin contends that when he entered into the contract with Warchol, he believed that he could properly perform the work.  The Barrys maintain that the mortgages granted on their Methuen Property in the year prior to their bankruptcy case filing were intended solely to pay creditors.  While Kevin acknowledges that his affidavit before the Superior Court was not fully accurate, Kevin states he was not trying to mislead the Superior Court or impede Warchol.  The Barrys also argue that personal hardships, including an illness from which Kimberly was suffering during the relevant time period, account for their failure to keep thorough records.  In sum, the Barrys maintain that Warchol's debt is dischargeable, and that they are entitled to their Chapter 7 discharges.

8

III.    DISCUSSION

    A.    Section 727(a)(2)(A)

    Section 727(a)(2)(A) of the Bankruptcy Code states:

    (a) The court shall grant the debtor a discharge, unless–

    . . .

    (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–

        (A) property of the debtor, within one year before the date of the filing of the petition . . .

11 U.S.C. § 727(a)(2)(A) (2010).  The Bankruptcy Appellate Panel for the First Circuit has held that "[s]ection 727(a)(2)(A)'s bar to discharge comprehends four elements . . . : (1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) his or her property, (3) within one year of the bankruptcy petition's filing, (4) with the intent to hinder, delay, or defraud a creditor."  R.I. Depositors Econ. Prot. Corp. v. Hayes (In re Hayes), 229 B.R. 253, 259 (B.A.P. 1st Cir. 1999).  See also Rowlands v. Fraser & AJF Fin. Corp. (In re Rowlands), 346 B.R. 279, 282 (B.A.P. 1st Cir. 2006); Marrama v. Citizens Bank of Mass. (In re Marrama), 445 F.3d 518, 522 (1st Cir. 2006).  "For § 727 objections to discharge, the substantive evidentiary standard of proof is preponderance of the evidence."  R.I. Depositors Econ. Prot. Corp., 229 B.R. at 259, n.7.

    "Given the serious nature of a discharge denial, the reasons for denying a discharge 'must be real and substantial, not merely technical and conjectural.'" Annino, Draper, & Moore, P.C. v. Lang (In re Lang), 246 BR. 463, 468 (Bankr. D. Mass. 2000) (citations and internal quotations omitted).  "In light of the effect on the Debtor, a denial of discharge is

an extreme step that should not be taken lightly, and, therefore, the provisions of § 727

should be construed liberally in favor of debtors." Id. (citations omitted).  The purpose of

the Bankruptcy Code is to grant a "fresh start" to the "honest but unfortunate debtor."

Grogan v. Garner, 498 U.S. 279, 286-87 (1991).

"On the other hand, the very purpose of certain sections of the law, like [§ 727], is

to make certain that those who seek the shelter of the bankruptcy code do not play fast and

loose with their assets or with the reality of their affairs."  Boroff v. Tully (In re Tully), 818

F.2d 106, 110 (1st Cir. 1987).  In those cases where debtors have been less than fair or

honest with their creditors or the Court, Congress provided § 727 as a means to deny them

the privilege of a bankruptcy discharge.

Notwithstanding the myriad of issues presented by the Complaint and the parties'

testimony at trial, disposition of this case need focus only on the four mortgages on the

Methuen Property granted within one year before the bankruptcy case was filed.  For the

purposes of analysis, three of the four elements of § 727(a)(2)(A) are easily found.  The

Barrys transferred interests in their property within one year of the filing of the bankruptcy

case.  The only remaining question is whether, in doing so, the Barrys intended to hinder,

delay, or defraud Warchol.

In order to meet her evidentiary burden, Warchol must show "actual, rather than

constructive, intent to hinder, delay, or defraud." Annino, Draper, & Moore, P.C., 246 B.R.

at 468; CIT Group/Sales Fin., Inc. v. Lord (In re Lord), 244 B.R. 196, 201 (Bankr. D.N.H.

1999).  Because "no debtor will admit to an improper intent," "[t]he Court must therefore

consider the surrounding facts and circumstances and draw inferences of a debtor's actual

intent from that debtor's actions."  Annino, Draper, & Moore, P.C., 246 B.R. at 469.  See

10

also <u>CIT Group/Sales Fin., Inc.</u>, 244 B.R. at 201 ("Actual intent may be inferred from a totality of the circumstances."). However, "the mere preferential payment of a valid debt is not a statutory ground for the denial of discharge . . .," [rather] "the preferential transfer must have been made with the specific intent to hinder, delay, or defraud creditors beyond that implied by a preference." <u>Everwed Co. v. Ayers (In re Ayers)</u>, 25 B.R. 762, 770 (Bankr. M.D. Tenn. 1982) (citations omitted). <u>See also First Leasing Co. v. McGalliard (In re McGalliard)</u>, 183 B.R. 726, 732 (Bankr. M.D.N.C. 1995) ("Although the mere intent to prefer one creditor over another cannot be equated with the intent to hinder, delay, or defraud required under § 727(a)(2), a debtor may not act to prefer one creditor with a specific intent to impermissibly hinder and delay another creditor.").

"While § 727(a)(2) requires the specific intent to hinder or delay a creditor, it does not require a finding of intent to defraud. The elements of the statute must be read in the disjunctive." <u>Id</u>. When determining whether the debtor intended to hinder or delay creditors, courts have looked toward several factors or "badges" including: "(1) whether the transaction is conducted at arms-length; (2) whether the debtor is aware of the existence of a significant judgment or over-due debt; (3) whether a creditor is in hot pursuit of its judgment/claim and whether debtor knows this; and (4) the timing of the transfer relative to the filing of the petition." <u>Taunt v. Wojtala (In re Wojtala)</u>, 113 B.R. 332, 336-37 (Bankr. E.D. Mich. 1990). <u>See also First Leasing Co.</u>, 183 B.R. at 732. "Furthermore, while just one of the 'badges' of intent to impermissibly hinder or delay is sufficient for § 727(a)(2) purposes, 'the accumulation of several factors indicates strongly that [a] debtor possessed the requisite intent.'" <u>Id</u>. at 733 (alteration in original) (citing <u>In re Lightfoot</u>, 152 B.R. 141,

11

148 (Bankr. S.D. Tex. 1993)).[11] "The requisite intent to delay or hinder a creditor may [also] be found where a debtor deals with his assets in a manner designed and intended to avoid seizure or attachment by one or more of his creditors." Id. at 734. "Moreover 'just one wrongful act may be sufficient to show actual intent . . . [although] a continuing pattern of wrongful behavior is a stronger indication [thereof].'" Roberts v. Montgomery (In re Montgomery), No. 05-3099, 2007 WL 625196, at *2 (Bankr. E.D. Tenn. Feb. 27, 2007) (alterations in original).

Viewing the totality of circumstances, this Court finds that the Barrys acted with actual intent to hinder and delay the collection of Warchol's claim. The evidence demonstrates a continuing pattern of behavior taken by the Barrys to impede any step Warchol took to access the equity in their properties. Service of process was made on or before July 19, 2004 in Warchol's suit against Kevin, which sought a prejudgment attachment. Very shortly thereafter, Kevin and Kimberly applied for a home equity loan in the amount of $90,000, eating up much of the equity in their home. On July 28, 2004, Kevin filed an opposition to Warchol's attachment request with an affidavit replete with

---

[11] Far more commonly, courts consider the following "objective indicia" of "fraudulent intent:"

> (1) insider relationships between the parties; (2) the retention of possession, benefit or use of the property in question; (3) the lack or inadequacy of consideration for the transfer; (4) the financial condition of the [debtor] both before and after the transaction at issue; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of the debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the events and transactions under inquiry; and (7) an attempt by the debtor to keep the transfer a secret.

Marrama, 445 F.3d at 522 (alteration in original). However, these factors are more relevant to an inquiry as to whether a debtor intended to defraud a creditor under § 727 rather than hinder or delay a creditor under the same section.

misrepresentations.  Neither the opposition nor the affidavit disclosed the pending home equity loan application.

In the year prior to the commencement of this case, Kevin and Kimberly granted four mortgages on the Methuen Property.  Two mortgages were granted to their attorneys in April and August of 2007, securing past and future services, prior to the arbitration award, but while Warchol's suit was pending.  A mere four days after the arbitrator entered a decision in Warchol's favor in the amount of $234,599.03, Kevin and Kimberly granted two more mortgages on the Methuen Property, one to their attorneys in the Warchol litigation and another to a business supplier.  And when they learned that Warchol had filed a request for a post-judgment real estate attachment on the Methuen Property, the Barrys sold the property the very next day, paying all of the mortgages from the proceeds of the sale.

The Barrys maintain that a judge of the Superior Court had reportedly found that the sale of the Methuen Property was at arms-length, and this Court has no reason to conclude otherwise; but that is just one factor to consider and here is largely besides the point.  The relevant question is not whether the buyer knew of the surrounding circumstances or whether a good price was obtained.  The relevant question is whether the Barrys' actions were intended to hinder or delay Warchol's ability to collect her debt.   The pattern and chronology of transfers by the Barrys can lead to no other conclusion.  Accordingly, this Court must deny a Chapter 7 discharge to the Barrys.

IV.      CONCLUSION

Under Count III of the Complaint, this Court will deny a Chapter 7 discharge to the

Barrys, pursuant to § 727(a)(2)(A).  Because this finding moots the remaining counts and

theories proffered by Warchol, the Court need not go further.

A separate judgment consistent with this Memorandum will issue.


DATED:   July 14, 2010

                                                  By the Court,

                                                  _____
                                                  Henry J.  Boroff
                                                  United States Bankruptcy Judge